Larry WHEATON, Plaintiff–Appellant,

v.

Freddye WEBB–PETETT, Administrator, Adult and Family Services Division of the State of Oregon, Defendant–Appellee.

Nos. 89–35470, 89–35524.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1991.

Decided May 1, 1991.

Richard C. Busse, Donald B. Potter, Portland, Or., for plaintiff-appellant.

Katherine H. Waldo, Asst. Atty. Gen., Salem, Or., for defendant-appellee.

Before BROWNING, WRIGHT and FARRIS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Larry Wheaton appeals the dismissal on summary judgment of his action challenging his removal from the State of Oregon's management service. We review de novo, viewing the evidence in the light most favorable to Wheaton, to determine whether any factual issue precludes summary judgment and whether the district court correctly applied the substantive law. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). We reverse and remand his property interest claim, affirm the dismissals of his liberty interest and first amendment claims and affirm that Webb–Petett is entitled to qualified immunity as to Wheaton's claims for damages.

I

BACKGROUND

In 1984, Wheaton became the manager of the Clackamas branch office of Oregon's Adult and Family Services Division (AFSD). AFSD serves a clientele of persons on welfare. Wheaton had by then

served the State of Oregon for 20 years in positions of increasing responsibility. As Clackamas Branch Manager, he consistently received the highest performance ratings possible.

Ben Talley, the manager for AFSD's Northern Region, was Wheaton's immediate supervisor. On January 14, 1988, Talley told Wheaton to clear his desk and leave that day because he was suspended. When Wheaton asked Talley what would happen after the suspension, Talley said that the head of AFSD, defendant Administrator Freddye Webb–Petett, wanted Wheaton fired. A few days later, Talley told Wheaton that he had been placed on administrative leave. Wheaton understood this to be a suspension with pay until he could be fired.

By letter of March 4, AFSD personnel specialist Bea Brooks notified Wheaton of his removal from the management service effective March 15 and his restoration to a position in the classified service. The letter described the basis for removal as Wheaton's "aggressive resistance" during December 1987 and January 1988 to a test program known as "NEW JOBS."

The purpose of NEW JOBS was to help clients escape welfare dependency through employment. It was to be implemented on a trial basis in selected AFSD offices, including Wheaton's. Wheaton had accepted the invitation of the legislative taskforce that designed NEW JOBS for Clackamas to serve as a pilot site.

Wheaton planned to contract out NEW JOBS work to existing community organizations. The other six pilot sites planned to implement NEW JOBS using Oregon state employees. Unionized Oregon employees opposed Wheaton's plan to contract out NEW JOBS work.

In detailing the basis for Wheaton's removal, the March 4 letter described several incidents. It referred to remarks by Wheaton during a December 1987 briefing for AFSD managers about NEW JOBS transi-

tion training. Reportedly, these remarks were to the effect that Wheaton's employees were not involved in NEW JOBS because of his plan to contract it out, so they would not be attending the NEW JOBS training. A January 5, 1988 meeting was cited, in which Wheaton was said to have made remarks that were "unsupportive" of AFSD's top management and of NEW JOBS.[1] Also mentioned was a small staff turnout for the Clackamas Branch Transition Training held on January 13, 1988 and Wheaton's "resistant behavior" at that training.

Wheaton sued Webb–Petett under 42 U.S.C. § 1983, charging that her actions deprived him of property and liberty interests without procedural due process. He also asserted that his removal was in retaliation for his constitutionally protected speech. The district court granted Webb–Petett's motion for summary judgment. It found no property, liberty or speech interests of constitutional stature and held that Webb–Petett was entitled to qualified immunity.

## II

### PROCEDURAL DUE PROCESS CLAIMS

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To hold Webb–Petett liable under section 1983 on a procedural due process theory, Wheaton must begin by establishing that he had either a property or a liberty interest meriting constitutional protection.

#### A

##### *Property Interest*

■ Constitutionally protected property interests "are created and their dimensions

---

1. Wheaton contends that he made his January 5 remarks in response to a facilitator's request for candid comments about presentations by Webb–Petett and her Deputy Administrator. His char-

acterizations of what he said are gentler than those found in the removal letter. For purposes of this appeal from summary judgment, we accept Wheaton's version as correct.

are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. "[Alt]hough state law creates a property interest, not all state-created rights rise to the level of a constitutionally protected interest." *Brady v. Gebbie*, 859 F.2d 1543, 1548 n. 3 (9th Cir.1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989). The question whether a state-created right triggers constitutional protections is a question of federal constitutional law. *Id.*

■ The district court found as a matter of law that Wheaton had no property interest in the Clackamas Branch Manager job. We review de novo a district court's legal rulings, whether these involve federal law or the law of the forum state. *Salve Regina College v. Russell*, — U.S. —, —––—, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991); *In re McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (de novo review applies to any state law interpretation by a district court, not merely to interpretations in diversity cases). After carefully considering the district court's legal analysis of the property interest issue, we hold it erroneous.

The Oregon management service, which was created in 1981, is a relatively recent refinement of that state's civil service. *See* Or.Rev.Stat. § 240.212 (1989). Before 1981, Oregon civil servants were assigned to one of three categories: the classified service, the unclassified service or the exempt service. *See id.* § 240.195.

The management service appears to be a hybrid between Oregon's classified and unclassified services. While neither the management nor the unclassified service is covered by the full panoply of Oregon merit system provisions, Or.Rev.Stat. § 240.240(1) (1989), more features of the

merit system apply to the management service than to the unclassified service. *Compare id.* § 240.240 *with id.* § 240.250 *and id.* § 240.570(3)–(5). In a previous examination of the Oregon civil service, we held that a regular employee in the classified service has a property right in continuing this employment but that an unclassified employee does not. *Brady v. Gebbie*, 859 F.2d 1543, 1548 (9th Cir.1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989).

The district court erred by treating *Brady* as controlling. Whether a member of Oregon's management service has a property interest in continuing that service is distinct from the question presented in *Brady:* whether an unclassified State Medical Examiner had a property interest. *See id.* at 1549. The *Brady* court recognized the distinction and reserved the former question. *See id.* at 1548 n. 4.[2]

We must determine whether Oregon statutes gave Wheaton a property interest in his management service position and, if so, whether this state-created interest sufficed to activate federal constitutional protections. We hold that both questions must be answered in the affirmative.

Under the State Personnel Relations Law, Oregon's management service is more protected than not. Like the state's classified employees, management employees are subject to a trial service period through which they earn job protections. *Compare* Or.Rev.Stat. § 240.316(1)(a), (c), (2) (1989) *with id.* § 240.570(3). For classified employees, job protection takes the form of a protection against dismissal "except for cause."[3] *See id.* § 240.316(2). Management employees are similarly protected. They cannot be removed unless "the employee is unable or unwilling to fully and faithfully perform the duties of

---

**2.** In *Brady*, we acknowledged but did not discuss the exempt and the management services. 859 F.2d at 1548 n. 4. The exempt service consists largely of elected officials, judges and part-time members of Oregon boards and commissions. Or.Rev.Stat. § 240.200. As its name implies, it is exempt from most provisions of Oregon's State Personnel Relations Law. *Id.* §§ 240.245, 240.005.

**3.** The statutorily recognized causes for discipline or dismissal are "misconduct, inefficiency, incompetence, insubordination, indolence, malfeasance or other unfitness to render effective service." Or.Rev.Stat. § 240.555 (1989).

the position satisfactorily." *Id.* § 240.570(3).

Both classified and management employees have rights to appeal disciplinary actions and dismissals to Oregon's Employee Relations Board. Or.Rev.Stat. §§ 240.560, 240.570(4) (1989). The Board must give the employee a remedy if it "finds that the action complained of was taken by the appointing authority for any political, religious or racial reasons, or because of sex, marital status or age," or if it "finds that the action was not taken in *good faith for cause.*" *Id.* § 240.560(3)–(4) (emphasis added).

Wheaton was more than an at-will employee. Good faith was required in Wheaton's removal process.

Wheaton had "a legitimate claim of entitlement," *see Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, to continue in management employment as long as he remained willing and able "to fully and faithfully perform the duties of the position satisfactorily." *See* Or.Rev.Stat. § 240.570(3) (1989). While this is a more limited property interest than that possessed by Oregon classified employees, it qualifies for federal constitutional protections. *Cf. Maddox v. Clackamas County School Dist. No. 25,* 293 Or. 27, 643 P.2d 1253, 1258 (1982) (in banc) (a teacher employed under a one-year contract who could not be dismissed absent good faith had a property interest in serving the full year).

■ We do not and can not, on this record, determine whether Wheaton received all of the process he was due. "'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)) (emphasis in original). "This principle requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (quoting *Roth,* 408 U.S.

at 569–70, 92 S.Ct. at 2705.) The precise timing and nature of the pretermination hearing is subject to case-by-case determination. *Brady,* 859 F.2d at 1554. Because Wheaton has raised genuine factual issues of whether his constitutional right to pretermination process was respected, we must remand this question.

### B
### *Liberty Interest*

■ The district court found that Wheaton's removal implicated no liberty interest of constitutional significance. Wheaton contends this was error. He argues in his brief that a removal without public explanation can cause stigma enough to create a protected liberty interest. At oral argument he emphasized that a stigma may result from the *manner* of removal.

We reject these arguments. A state's accusations against an employee do not implicate a constitutional liberty interest unless they seriously damage his community standing and associations or foreclose his freedom to pursue other employment. *Roley v. Pierce County Fire Protection Dist. No. 4,* 869 F.2d 491, 495 (9th Cir. 1989). It is the nature of the charges, not their actual consequences, that determines whether they implicate a liberty interest.

Charges that carry the stigma of moral turpitude may implicate a liberty interest, but charges of incompetence or inability to get along with others do not. *Id.* We must also distinguish charges that simply reduce economic rewards and diminish prestige from those with more serious consequences, such as a protracted hiatus in employment or a permanent exclusion from a profession or trade. *Id.* at 496.

Measured against these standards, the charges against Wheaton fall far short of establishing a liberty interest that would entitle him to procedural due process. We affirm this part of the summary judgment on his procedural due process claim.

### III

### FIRST AMENDMENT CLAIM

■ Wheaton also argues that his removal was in retaliation for his constitu-

tionally protected speech. The district court concluded that Wheaton's speech was not protected because it did not involve matters of public concern.

"[A] State may not discharge a[ ] [public] employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). Whether particular speech qualifies for constitutional protections is a question of law. *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 1690 n. 7, 1692 n. 10, 75 L.Ed.2d 708 (1983).

A two-step analysis determines whether federal courts will protect the speech at issue. The threshold question is whether it addresses matters of "public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. If it does, we must balance the employee's "interest in making her statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

Viewed in the light most favorable to Wheaton, the speech in question attempted to prevent AFSD from wasting public funds and mismanaging its business. Wheaton engaged in all of his speech while at work, during meetings with others involved in implementing NEW JOBS.

We need not resolve whether this speech involved matters of public concern. Assuming *arguendo* that it did, key undisputed facts show that the balance between employee and employer interests undeniably favors the latter.

Wheaton has a strong interest in the unfettered exercise of his first amendment franchise. This interest is tempered, however, by the "burden of caution" that attended his managerial position. *See id.* at 390, 107 S.Ct. at 2900. In striking the proper balance, pertinent considerations include "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899.

Wheaton spoke as a dissenting manager. Others found his remarks disturbing and strongly critical of AFSD management. In contrast to *Rankin*, here the risk that Wheaton's persistent speech might endanger the AFSD's successful implementation of the NEW JOBS pilot was far greater than "minimal." *See id.* at 391, 107 S.Ct. at 2900. Almost simultaneously with Wheaton's suspension, the participation of the Clackamas Branch in the NEW JOBS pilot was halted because Wheaton and the Deputy Administrator agreed that Clackamas would not be ready to implement NEW JOBS on February 1, 1988 as scheduled.

AFSD had a strong interest in the smooth implementation of NEW JOBS. This interest outweighed any personal interest that Wheaton had in expressing his dissent. Because Wheaton was not removed in retaliation for constitutionally protected speech, we affirm the summary judgment on his first amendment claim.

## IV

### QUALIFIED IMMUNITY

 The district court held that Webb–Petett was entitled to qualified immunity on Wheaton's property interest claim. Qualified immunity shields public employees who perform discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

 Whether the legal rights allegedly violated were clearly established must not be analyzed too abstractly. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The

appropriate inquiry is the particularized one of whether, in light of pre-existing law, the unlawfulness of the official's actions must have been apparent. *Id.* at 640, 107 L.Ed.2d at 3039. Having reviewed the law that was clearly established in early 1988, we conclude that it would not have been apparent to a reasonable official that Wheaton had a property interest in his management service employment.

As the district court noted, in January 1988 there was a dearth of case authority, either state or federal, concerning whether an Oregon management employee had a property interest in that employment. While relevant, this alone does not establish qualified immunity. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

Early in 1988, the general standard governing whether a public employee had a job property interest was clearly established. For claims like Wheaton's, Supreme Court precedent required consideration of whether the employee had a "legitimate claim of entitlement" to the job, rather than a "unilateral expectation of it," grounded in a source such as state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). But when analyzing whether positive law restricted the grounds for discharge, courts have used dichotomous terminology like "for cause" and "at will" to describe the presence and absence of a constitutionally sufficient restriction. *E.g., Dorr v. County of Butte,* 795 F.2d 875, 878 (9th Cir. 1986); *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) ("The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" (citations omitted)). Typically, permanent and classified employees have been held to have property interests, *e.g., Dorr,* 795 F.2d at 876, while probationary and non-classified employees have not. *E.g., Dorr,* 795 F.2d at 876 n. 1, 878 (probationary employees); *Mitchell v. King,* 537 F.2d 385, 390–91 (10th Cir.1976) (museum regent who was exempt from state's civil service).

We therefore conclude that Wheaton's property interest would not have been apparent to a reasonable official in Webb–Petett's situation. Early in 1988, Oregon's management service was still a new and unusual innovation. The parties have cited no cases applying *Roth* to closely analogous employments nor has our research disclosed any. The dichotomous reasoning that characterizes the cases was ill-adapted to predicting the treatment of a hybrid employment like Wheaton's. While we conclude that Oregon law gave Wheaton a property interest, this question was fairly debatable in early 1988. Webb–Petett is entitled to qualified immunity with respect to Wheaton's claims for damages.

V

Since Wheaton had a property interest, we must remand for determination of whether he received the process that he was due. Because we have held that Webb–Petett was entitled to qualified immunity, we include the following remarks to assist the district court on remand.

Wheaton's complaint prayed for damages and attorney's fees. He also sought

[a]n injunction declaring that Defendant's suspension and removal of Plaintiff from the management service was unlawful, null and void, and requiring Defendant to hold a due process hearing before suspending or terminating Plaintiff's employment in the management service or taking other adverse personnel actions against Plaintiff.

Webb–Petett interposed an eleventh amendment defense that the court had no jurisdiction to enter a money judgment against the State of Oregon. The district court did not reach this issue.

The eleventh amendment does limit the relief available to a section 1983 plaintiff. "Though a § 1983 action may be instituted ... [against state officials], a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief ... and may not include a retroactive award which requires the payment of funds from the state treasury...." *Edelman v. Jordan,* 415

U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) (citations omitted); *see also Chaloux v. Killeen,* 886 F.2d 247, 250 (9th Cir.1989) (characterizing backpay as a form of retrospective relief). A section 1983 plaintiff may obtain damages only from the personal estates of the defendant state officials, not from the state treasury. *Price v. Akaka,* 928 F.2d 824, 827–28 & n. 4 (9th Cir.1991). But Webb–Petett's qualified immunity forecloses Wheaton from seeking such damages.

Wheaton's request for injunctive relief may be another matter. "[I]mmunity from damages does not ordinarily bar equitable relief...." *Wood v. Strickland,* 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975) (modified on other grounds by *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The *Harlow* Court emphasized that "our decision applies only to suits for civil *damages*" and expressed no view about the availability of declaratory or injunctive relief. 457 U.S. at 819 n. 34, 102 S.Ct. at 2739 n. 34 (emphasis in original).

■ We have answered the question reserved in *Harlow.* We have permitted section 1983 plaintiffs to seek prospective injunctive relief against state officials who have personal immunity from damages. *Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1175–76 (9th Cir.1984) (state officials enjoy no immunity from actions to enjoin them from exercising authority under allegedly unconstitutional state statutes). On remand, the district court may determine whether Wheaton retains any viable claim for injunctive relief against Webb–Petett in her official capacity.

## CONCLUSION

The district court correctly dismissed Wheaton's liberty interest and free speech claims but erred by dismissing the property interest claim. On remand, the district court must determine whether Wheaton's removal was preceded by constitutionally

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth

adequate process. Costs will await this determination.

AFFIRMED in part, REVERSED in part and REMANDED. Assessment of costs will be determined on remand.